******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# DANIEL DIAZ *v.* COMMISSIONER OF CORRECTION
## (SC 20536)

Robinson, C. J., and McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.

*Syllabus*

Pursuant to statute (§ 54-1f (b)), a police officer "shall arrest, without previous complaint and warrant, any person who the officer has reasonable grounds to believe has committed or is committing a felony."

The petitioner, who had been convicted of various drug and weapons charges, sought a writ of habeas corpus, claiming, inter alia, that his trial counsel, C, had rendered ineffective assistance. The petitioner specifically alleged that C had a conflict of interest insofar as he was employed as an active duty New Haven police officer while simultaneously representing the petitioner in criminal proceedings in the judicial district of New Britain. Before C began representing criminal defendants, he sought the advice of corporation counsel for the city of New Haven, who concluded that C's representation of criminal defendants was not inappropriate, so long as it occurred outside of the New Haven judicial district. In his habeas petition, the petitioner alleged, inter alia, that C failed to disclose his employment as a police officer to him and that, as a result of this conflict of interest, C failed to adequately cross-examine the New Britain police officers who arrested the petitioner and searched his apartment. The habeas court denied the petition, concluding, inter alia, that there was no evidence that C's representation of the petitioner was directly adverse to another client or limited by C's responsibilities to the New Haven Police Department. Specifically, the court implicitly agreed with and credited C's view that his obligations as a police officer under § 54-1f (b) did not give rise to a conflict of interest when he represented criminal defendants in locales other than New Haven. Thereafter, the petitioner filed a petition for certification to appeal, which the habeas court denied, and the petitioner appealed to the Appellate Court, which dismissed the petitioner's appeal. On the granting of certification, the petitioner appealed to this court. *Held*:

1. This court declined the respondent's invitation to revisit the question of which standard applies to ineffective assistance of counsel claims based on personal conflicts of interest that do not involve the concurrent representation of multiple clients: because the petitioner could not prevail under the standard currently followed by this court, as articulated in *Cuyler* v. *Sullivan* (446 U.S. 335), which requires a petitioner to establish, inter alia, that an actual conflict of interest adversely affected defense counsel's performance, it was not necessary for this court to consider whether it should instead follow the majority of federal courts of appeals that have concluded that the more stringent standard set forth in *Strickland* v. *Washington* (466 U.S. 668), which requires a petitioner to establish that there is a reasonable probability that, but for the attorney's deficient performance, the result of the proceeding would have been different, applies in habeas cases involving purely personal conflicts of interest.

2. The petitioner could not prevail on his claim that it is a per se conflict of interest for an individual to simultaneously serve as a Connecticut police officer and to represent a criminal defendant, even if the alleged crimes were committed, investigated, and prosecuted outside of the city or town in which the officer serves: although the use of the phrase "shall arrest" in § 54-1f (b) suggested, as the petitioner argued, that police officers have a mandatory and nondiscretionary duty to arrest all suspected felons under all circumstances, regardless of when or where the suspected crime was committed, the petitioner's interpretation was not the only plausible reading of the statutory language; moreover, adopting the petitioner's interpretation of § 54-1f (b) would lead to absurd and unworkable results insofar as treating the statute as mandatory would deprive police officers of the necessary discretion as to whether and when to arrest a suspected felon and would require them to make arrests, even when the suspected crime was committed

long ago, outside of the statute of limitations, or outside of the officer's jurisdiction; accordingly, this court concluded that, although § 54-1f (b) gives patrolling officers the authority to arrest suspected felons they encounter, it does not require off duty officers, such as C, to arrest their clients whenever they suspect that those clients may have committed other crimes, even outside of the officer's jurisdiction; nevertheless, because the petitioner raised a colorable question of statutory interpretation that previously had not been directly addressed by the appellate courts of this state, this court concluded that the habeas court had abused its discretion in denying the petition for certification to appeal, and, accordingly, the Appellate Court improperly dismissed the petitioner's appeal from that denial.

3. There was no merit to the petitioner's claim that C's undisclosed status as a police officer became an actual conflict of interest during the petitioner's criminal trial insofar as it led C to hold back when cross-examining other police officers; the habeas court thoroughly analyzed the petitioner's claims of inadequate cross-examination and found them to be without merit, the Appellate Court reviewed the petitioner's challenges to the findings and conclusions of the habeas court and found them to be meritless, and this court saw no reason to second-guess the habeas court's determination that there was no constitutionally relevant actual conflict of interest because the petitioner was unable to establish prejudice under *Sullivan* by showing that C had failed to pursue some plausible, alternative defense strategy or tactic that was inherently in conflict with or not undertaken due to C's other loyalties; nevertheless, this court emphasized that, although the petitioner did not demonstrate an actual conflict of interest, it did not condone C's failure to disclose to the petitioner that he was also employed as a police officer or C's decision to mislead the Office of the Chief Public Defender by vaguely listing his employment with New Haven as a "municipal employee," rather than as a police officer, on his application for a special public defender contract, which were unbecoming of an officer of the court.

(*Two justices concurring in one opinion*)

Argued December 17, 2021—officially released August 16, 2022

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and transferred to the judicial district of Fairfield, where the case was tried to the court, *Devlin, J.*; judgment denying the petition; thereafter, the court denied the petition for certification to appeal, and the petitioner appealed to the Appellate Court, *DiPentima, C. J.*, and *Alvord* and *Keller, Js.*, which dismissed the appeal, and the petitioner, on the granting of certification, appealed to this court. *Improper form of judgment*; *reversed*; *judgment directed*.

*Robert L. O'Brien*, assigned counsel, with whom, on the brief, was *Christopher Y. Duby*, assigned counsel, for the appellant (petitioner).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *Brian W. Preleski*, former state's attorney, and *Angela R. Macchiarulo*, senior assistant state's attorney, for the appellee (respondent).

*Opinion*

MULLINS, J. The petitioner, Daniel Diaz, appeals from the judgment of the Appellate Court dismissing his appeal from the judgment of the habeas court. The primary issue on appeal is whether the habeas court abused its discretion by denying his petition for certification to appeal with respect to the claim that his defense counsel at his second criminal trial rendered ineffective assistance of counsel by laboring under a conflict of interest, namely, simultaneously working as defense counsel and as an active duty police officer in a different city. Although counsel's failure to disclose the potential conflict to the petitioner is deeply troubling, and although we conclude that the legal issues raised are fairly debatable among jurists of reason, such that certification to appeal should have been granted, we ultimately agree with the respondent, the Commissioner of Correction, that the petitioner failed to prove his claim that his counsel labored under an actual conflict of interest.

I

The opinion of the Appellate Court sets forth the following relevant facts and procedural history. See *Diaz* v. *Commissioner of Correction*, 200 Conn. App. 524, 526–29, 545–47, 240 A.3d 795 (2020). "In early 2001, the [petitioner] was under investigation by the New Britain [P]olice [D]epartment for illegal drug related activities. On March 13, 2001, New Britain police officers arrested Kevin Lockery, who was known by the police as a drug user, for a narcotics offense. In an effort to gain lenient treatment, Lockery identified the [petitioner] as a drug dealer and provided the police with information about the [petitioner]. At the direction of the police, Lockery called the [petitioner] on a [cell] phone] and arranged to purchase five bags of heroin at a specific location in New Britain. Shortly after the [petitioner] received Lockery's call, the [petitioner] left his residence and drove to that location. Lockery did not meet the [petitioner] as arranged, and, after several minutes, the [petitioner] began to drive away.

"Police officers stopped the [petitioner's] automobile. A search of the [petitioner] yielded twenty-five packets of heroin, $1025 and a [cell] phone that displayed among received calls the telephone number from which Lockery had called the [petitioner] to arrange the drug purchase. A subsequent search of the [petitioner's] residence, pursuant to a warrant, yielded 168 packets of heroin, [16] grams of marijuana, a [12] gauge shotgun, several shotgun shells and numerous other items typically used in the sale and distribution of illegal drugs. . . .

"In his first criminal trial in 2002, the petitioner was found guilty by a jury of having committed multiple charged offenses, but the judgment of conviction was reversed by [this court] because the petitioner had

received an inadequate canvass from the trial court regarding his decision to waive counsel and [to] represent himself. See *State* v. *Diaz*, 274 Conn. 818, 828, 878 A.2d 1078 (2005). In his second criminal trial in 2006, the petitioner was found guilty by a jury of [one count of] possession of narcotics with intent to sell by a person who is not drug-dependent in violation of General Statutes [Rev. to 2001] § 21a-278 (b), two counts of possession of narcotics in violation of General Statutes [Rev. to 2001] § 21a-279 (a), and [one count of] criminal possession of a firearm in violation of General Statutes [Rev. to 2001] § 53a-217 (a) (1). [The Appellate Court] affirmed the judgments of conviction on appeal. See *State* v. *Diaz*, [109 Conn. App. 519, 559, 952 A.2d 124, cert. denied, 289 Conn. 930, 958 A.2d 161 (2008)]." (Citation omitted; internal quotation marks omitted.) *Diaz* v. *Commissioner of Correction*, supra, 200 Conn. App. 526–27.

"[In] . . . 2015, the petitioner . . . filed an amended petition for a writ of habeas corpus, which is the operative petition in this appeal. The petition contained five counts, only [one] of which [is] relevant to this appeal." Id., 528. "In the third count, the petitioner alleged that Frank Canace, his defense counsel in the second criminal trial, had a conflict of interest as a result of his employment as a New Haven police officer while representing the petitioner as a special public defender." Id.

The petitioner alleged that "Canace served as a special public defender representing indigent criminal defendants in . . . the judicial district of New Britain. While representing the petitioner, Canace was employed as a police officer for the city of New Haven. The petitioner was not aware that Canace was employed as a New Haven police officer, and Canace did not inform him of that fact." Id., 545.

"Before Canace began representing criminal defendants in approximately 1996 or 1997, Canace [had] made known to the New Haven Police Department his desire to do so. To determine whether it was appropriate for Canace to be employed as a New Haven police officer while simultaneously representing criminal defendants, corporation counsel for the city of New Haven solicited opinions on the matter from the American Bar Association, the Statewide Grievance Committee, and the New Haven state's attorney's office. Corporation counsel concluded that Canace could represent criminal defendants in Connecticut courts, with the exception of those located in the judicial district of New Haven." Id., 545–46.

"In 2006, Preston Tisdale, an attorney employed as the director of the special public defender program at the Division of Public Defender Services, was informed that Canace was employed as a New Haven police officer while also representing criminal defendants as a

special public defender. Tisdale consulted with the Office of the Chief Public Defender and, ultimately, decided that Canace would have to resign as a special public defender. Tisdale provided two reasons for his decision: (1) Canace exhibited a lack of candor in his application for a special public defender contract by vaguely describing his position for the city of New Haven as a municipal employee, and (2) other clients of Canace might raise ineffective assistance of counsel claims against him.

"In his petition, the petitioner alleged that Canace had a conflict of interest as a result of his employment as a police officer while representing the petitioner. The petitioner further alleged that Canace's conflict of interest presented itself when he failed (1) to move to dismiss the petitioner's criminal charges on double jeopardy grounds, (2) to identify false statements by police officers in the search warrant affidavit, and (3) to adequately cross-examine police officers regarding their prior inconsistent statements and the different logos on the packaging of the drugs seized from the petitioner and those on Lockery's person during his arrest. The petitioner also alleged particular instances in which Canace provided deficient performance at [the petitioner's] second criminal trial." (Internal quotation marks omitted.) Id., 546–47.

A trial on the habeas petition was held in 2017. Id., 529. The habeas court denied each of the petitioner's claims. Id. With respect to the claim that Canace labored under an actual conflict of interest, the court found no evidence that "Canace's representation of the petitioner was directly adverse to another client" or that it was "limited by his responsibilities to the New Haven Police Department." Among other things, the habeas court implicitly agreed with and credited Canace's view that his obligations as a police officer under General Statutes § 54-1f (b)[1] did not give rise to a conflict of interest when he represented criminal defendants in other locales. Ultimately, the habeas court determined that Canace's representation of the petitioner was not limited by his responsibilities to the New Haven Police Department.

Thereafter, the petitioner filed a petition for certification to appeal from the denial of his petition for a writ of habeas corpus, which the habeas court denied. See *Diaz* v. *Commissioner of Correction*, supra, 200 Conn. App. 529. The petitioner then appealed to the Appellate Court, and that court dismissed the appeal, finding no merit to the petitioner's claims. See id., 554. This certified appeal followed.[2] Additional facts will be set forth as necessary.

II

A

The following legal principles govern our resolution of the petitioner's appeal. "We begin by setting forth

the applicable standard of review. The habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . . The application of [the pertinent legal standard to] the habeas court's factual findings . . . however, presents a mixed question of law and fact, which is subject to plenary review. . . .

"Faced with the habeas court's denial of certification to appeal, a petitioner's first burden is to demonstrate that the habeas court's ruling constituted an abuse of discretion. . . . A petitioner may establish an abuse of discretion by demonstrating that the issues are debatable among jurists of reason . . . [the] court could resolve the issues [in a different manner] . . . or . . . the questions are adequate to deserve encouragement to proceed further. . . . The required determination may be made on the basis of the record before the habeas court and the applicable legal principles. . . . If the petitioner succeeds in surmounting that hurdle, the petitioner must then demonstrate that the judgment of the habeas court should be reversed on its merits. . . . In determining whether the habeas court abused its discretion in denying the petitioner's request for certification, we necessarily must consider the merits of the petitioner's underlying claims to determine whether the habeas court reasonably determined that the petitioner's appeal was frivolous." (Citation omitted; internal quotation marks omitted.) *Moore* v. *Commissioner of Correction*, 338 Conn. 330, 338–39, 258 A.3d 40 (2021); see also *Simms* v. *Warden*, 230 Conn. 608, 612, 615–16, 646 A.2d 126 (1994). Certification to appeal should be granted when, for example, the appeal presents colorable issues of first impression in Connecticut appellate courts. See, e.g., *Anderson* v. *Commissioner of Correction*, 204 Conn. App. 712, 716–17, 254 A.3d 1011, cert. denied, 338 Conn. 914, 259 A.3d 1179 (2021).

"It is axiomatic that the [sixth amendment] right to counsel is the right to the effective assistance of counsel. . . . As an adjunct to this right, a criminal defendant is entitled to be represented by an attorney free from conflicts of interest." (Citations omitted; internal quotation marks omitted.) *Phillips* v. *Warden*, 220 Conn. 112, 132, 595 A.2d 1356 (1991). "We have described an attorney's conflict of interest as that which impedes his paramount duty of loyalty to his client." *State* v. *Crespo*, 246 Conn. 665, 689, 718 A.2d 925 (1998), cert. denied, 525 U.S. 1125, 119 S. Ct. 911, 142 L. Ed. 2d 909 (1999).

"[Although] the right to [conflict free] representation typically is implicated in cases involving representation of criminal codefendants by a single attorney . . . it is equally applicable in other cases [in which] a conflict of interest may impair an attorney's ability to represent his [or her] client effectively." (Citations omitted; internal quotation marks omitted.) *Phillips* v. *Warden*, supra, 220 Conn. 134–35. An attorney may confront a

potential ethical conflict, for example, when representation of a client "somehow implicates counsel's personal or financial interests . . . ." (Citations omitted.) *Mickens* v. *Taylor*, 535 U.S. 162, 174–75, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002); see, e.g., *State* v. *Crespo*, supra, 246 Conn. 689–90 ("an attorney [also] may be considered to be laboring under an impaired duty of loyalty, and thereby be subject to conflicting interests, because of interests or factors personal to him that are inconsistent, diverse or otherwise discordant with [the interests] of his client" (internal quotation marks omitted)).

Under the sixth amendment to the United States constitution, as construed by the federal courts, whether a criminal conviction may be reversed on the basis of an attorney's conflicted loyalties depends on both the nature of the conflict alleged and whether that conflict was brought to the timely attention of the trial court. Courts apply three different standards to such claims, each of which arguably applies to the petitioner's claims in the present case.

First, under extremely limited circumstances, a conflict of interest can, in essence, be a form of structural error; see, e.g., *Weaver* v. *Massachusetts*, U.S. , 137 S. Ct. 1899, 1907–1908, 198 L. Ed. 2d 420 (2017) (discussing structural error doctrine); for which automatic reversal of a conviction is warranted, without regard to prejudice. To date, the United States Supreme Court has identified only one such scenario: automatic reversal is required when an attorney simultaneously represents multiple criminal codefendants, whose interests may be expected to be mutually adverse, and defense counsel timely represents to the trial court that joint, concurrent representation will create a potential conflict of interest, but the court neither releases counsel from the obligation nor determines that there is no conflict. In that circumstance, an attorney's divided loyalties may be presumed, and there is a per se violation of the sixth amendment right to counsel. See, e.g., *Mickens* v. *Taylor*, supra, 535 U.S. 168, citing *Holloway* v. *Arkansas*, 435 U.S. 475, 488, 98 S. Ct. 1173, 55 L. Ed. 2d 426 (1978).

The United States Supreme Court has not identified any conflicts, other than multiple representation scenarios in which a trial court knowingly and improperly permits joint representation, that would amount to per se violations of the sixth amendment and thus require automatic reversal of a conviction. Although the Supreme Court has not extended *Holloway* v. *Arkansas*, supra, 435 U.S. 488, to other types of conflicts of interest, the lower federal courts have recognized certain other situations in which automatic reversal is warranted. For example, the United States Court of Appeals for the Second Circuit has deemed it to be a per se violation of the sixth amendment when defense counsel is not authorized to practice law or when defense counsel is

implicated in the very crime for which his or her client is on trial. See, e.g., *United States* v. *Kaid*, 502 F.3d 43, 46 (2d Cir. 2007) (citing cases). Although, in the present case, the petitioner's position is not entirely clear, we understand one of his arguments to be that we should further extend the reasoning of *Holloway*—and find a per se violation of the sixth amendment—to situations in which an attorney is employed as a Connecticut police officer while representing a criminal defendant. He argues that counsel in such cases is inherently conflicted by virtue of a Connecticut police officer's mandatory obligation to arrest suspected felons pursuant to § 54-1f (b). He contends that this statutory obligation creates an actual conflict, tantamount to structural error, for which automatic reversal is required. We address this claim in part II B 1 of this opinion.

Second, for certain alleged conflicts of interest, the federal courts apply the standard that the United States Supreme Court articulated in *Cuyler* v. *Sullivan*, 446 U.S. 335, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980).[3] The *Sullivan* standard is often framed as a two part test: "[I]n order to establish a violation of the sixth amendment" right to counsel based on defense counsel's actual, undisclosed conflict of interest, a petitioner "must establish (1) that counsel actively represented conflicting interests and (2) that [the] actual conflict of interest adversely affected his [counsel's] performance." (Internal quotation marks omitted.) *Phillips* v. *Warden*, supra, 220 Conn. 133; see also *Cuyler* v. *Sullivan*, supra, 348, 350. Although framed as a two part test, however, in practice, "[t]hese components are considered in a single, integrated inquiry." *Eisemann* v. *Herbert*, 401 F.3d 102, 107 (2d Cir. 2005). That is to say, "the *Sullivan* standard is not properly read as requiring inquiry into actual conflict as something separate and apart from adverse effect. An actual conflict, for [s]ixth [a]mendment purposes, is a conflict of interest that adversely affects counsel's performance." (Internal quotation marks omitted.) *Mickens* v. *Taylor*, supra, 535 U.S. 172 n.5; see also, e.g., *Russell* v. *Armstrong*, Docket No. Civ. A. 300CV1116SRU, 2006 WL 287203, *4 (D. Conn. February 2, 2006) ("[t]he actual conflict and adverse effect analyses are not distinct" (internal quotation marks omitted)).

Third, any alleged attorney conflicts of interest that are not subject to automatic reversal and that are not governed by the *Sullivan* standard are, like most other ineffective assistance of counsel claims, presumptively governed by *Strickland* v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The primary difference between *Sullivan* and *Strickland* is the lower burden that the petitioner must shoulder to establish a violation under *Sullivan*. See, e.g., *Mickens* v. *Taylor*, supra, 535 U.S. 174, 176; see also, e.g., *Rodriguez* v. *Commissioner of Correction*, 312 Conn. 345, 352, 92 A.3d 944 (2014).

Under *Strickland*, a petitioner must demonstrate that there is a reasonable probability that, but for the attorney's deficient performance, the result of the proceeding would have been different. *Strickland* v. *Washington*, supra, 466 U.S. 694. By contrast, to demonstrate the adverse effect of a conflicted representation under *Sullivan*, the petitioner need only establish that "a conflict of interest actually affected the adequacy of [the] representation . . . ." *Cuyler* v. *Sullivan*, supra, 446 U.S. 349–50. This court has said that, "[t]o prove a lapse of representation [under *Sullivan*], a [petitioner] must demonstrate that some plausible alternative defense strategy or tactic might have been pursued but was not and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." (Internal quotation marks omitted.) *State* v. *Davis*, 338 Conn. 458, 478 n.13, 258 A.3d 633 (2021). In such cases, prejudice is presumed.[4] See, e.g., *Rodriguez* v. *Commissioner of Correction*, supra, 312 Conn. 352–53.

The first question we must resolve is whether *Sullivan* or *Strickland* governs the petitioner's claim that Canace was encumbered by an actual conflict of interest that rendered his representation of the petitioner ineffective by, among other things, causing him to hold back when cross-examining police witnesses. See part II B 2 of this opinion. The respondent notes that there is a division among the lower federal courts as to how to apply the United States Supreme Court's conflict of interest cases with regard to personal conflicts of the type at issue in the present case. Prior to *Mickens*, many, if not most, federal courts that addressed the issue had assumed that such conflicts are governed by *Sullivan*. See, e.g., *Mickens* v. *Taylor*, supra, 535 U.S. 174–75 (citing cases). Consistent with that approach, in *Phillips*, this court applied the *Sullivan* standard to an attorney's personal conflicts of interest vis-à-vis a single client. See *Phillips* v. *Warden*, supra, 220 Conn. 133, 136, 144. In *Mickens*, however, the United States Supreme Court questioned the propriety of the lower courts' "expansive application" of *Sullivan* to cases of attorney ethical conflicts, noting that the rationales for departing from the *Strickland* standard do not necessarily apply outside of the multiple concurrent representation context, such as when an attorney's personal interests are at issue. *Mickens* v. *Taylor*, supra, 174–75. The court left open the question of whether *Sullivan* should be extended to personal conflict of interest cases. See id., 176.

Following *Mickens*, the majority of federal courts of appeals have taken the position that, in order to prevail on a claim of ineffective assistance of counsel that is based on an alleged personal conflict of interest, the petitioner or defendant must establish *Strickland* prejudice. See, e.g., *McRae* v. *United States*, 734 Fed. Appx.

978, 983 (6th Cir. 2018) (purporting to join United States Courts of Appeals for First, Second, Fifth, Sixth, Eighth, Tenth and Eleventh Circuits in requiring showing of *Strickland* prejudice), cert. denied, U.S. , 139 S. Ct. 1599, 203 L. Ed. 2d 757 (2019). Those courts reasoned that the United States Supreme Court has cautioned against overbroad application of *Sullivan* and that it is often possible to identify specific harms arising from the conflicted representation in such cases. See, e.g., id., 984; see also, e.g., id., 983 (citing cases). Other federal courts of appeals have continued to apply the *Sullivan* presumed prejudice standard in personal conflict of interest cases, reasoning that, just as in cases of multiple representation, "it is difficult to measure the precise effect on the defense when representation is corrupted by conflicting interests." (Internal quotation marks omitted.) *Rubin* v. *Gee*, 292 F.3d 396, 402 (4th Cir.), cert. denied, 537 U.S. 1048, 123 S. Ct. 637, 154 L. Ed. 2d 523 (2002); see, e.g., *Reynolds* v. *Hepp*, 902 F.3d 699, 708 (7th Cir. 2018) ("[s]ince before *Mickens*, we have at least assumed that *Sullivan* extends to financial conflicts of interests"), cert. denied, U.S. , 140 S. Ct. 160, 205 L. Ed. 2d 51 (2019); *United States* v. *Walter-Eze*, 869 F.3d 891, 900 (9th Cir. 2017) (assuming, without deciding, that *Sullivan* applies to cases of pecuniary conflict), cert. denied, U.S. , 139 S. Ct. 1196, 203 L. Ed. 2d 226 (2019); *Rubin* v. *Gee*, supra, 401–402 (applying *Sullivan*).

This court has followed the latter approach, continuing to broadly apply *Sullivan*, even in the wake of *Mickens*. See, e.g., *State* v. *Davis*, supra, 338 Conn. 477–78. The respondent invites us to revisit the question in the present case, emphasizing the need for some reliable benchmark by which to assess the impacts of an alleged conflict of interest. Because the petitioner cannot prevail even under the more petitioner-friendly *Sullivan* standard; see part II B 2 of this opinion; however, we decline to revisit at this time the question of whether *Strickland* prejudice must be demonstrated in habeas cases involving purely personal conflicts of interest.

B

With these principles in mind, we now consider the merits of the petitioner's habeas petition to determine whether the test we adopted in *Simms* v. *Warden*, supra, 230 Conn. 612, 615–16, is satisfied. We understand the petitioner to be making two claims with respect to Canace's alleged conflict of interest. First, the petitioner contends that, as a matter of law, a Connecticut police officer cannot serve as defense counsel—at least, not without an adequate waiver—because the duties entailed by those two roles are necessarily in conflict. For this claim, the petitioner seeks to have us extend *Holloway*, on the rationale that his claim involves an inherent conflict and, thus, structural error. Second, the petitioner contends that, in this particular

case, Canace's obligations as a police officer undermined his ability to effectively represent the petitioner, giving rise to an actual conflict of interest under *Sullivan*.[5] We consider each claim in turn.

1

The petitioner first argues that for an individual to simultaneously serve as a Connecticut police officer and to represent a criminal defendant creates a per se conflict of interest, even if the alleged crimes were committed, investigated, and prosecuted outside of the city or town in which the officer serves. Although we have not previously had cause to consider the issue, we agree with those courts that have concluded that for a police officer to serve as defense counsel in a different jurisdiction does not create a categorical conflict of interest. See, e.g., *Paradis* v. *Arave*, 130 F.3d 385, 391 (9th Cir. 1997); *State* v. *Gonzales*, 483 So. 2d 1236, 1236–37 (La. App. 1986). But see, e.g., *People* v. *Gelbman*, 150 Misc. 2d 466, 468, 568 N.Y.S.2d 867 (Justice Ct. 1991) (rule of professional conduct barred representation). This case law is consistent with the guidance that Canace received from the Statewide Grievance Committee and New Haven corporation counsel, namely, that his representation of criminal defendants was permissible, provided it occurred outside of the judicial district of New Haven and was properly disclosed. Indeed, a properly notified criminal defendant may well benefit from a police officer's experience and insider knowledge of police work. See, e.g., *State* v. *Gonzales*, supra, 1237 (arguable that "the complained of conflict of interest worked to the appellant's benefit [because] counsel's knowledge of police procedures was an asset in developing the defense strategy").

Although the petitioner does not necessarily disagree that a police officer might provide conflict free representation in some other state, he contends that for an individual to simultaneously serve as a *Connecticut* police officer and to represent a criminal defendant creates an inherent conflict of interest because all of this state's police officers are bound by § 54-1f (b). That provision provides that "[m]embers of the Division of State Police within the Department of Emergency Services and Public Protection or of any local police department or any chief inspector or inspector in the Division of Criminal Justice shall arrest, without previous complaint and warrant, any person who the officer has reasonable grounds to believe has committed or is committing a felony."[6] General Statutes § 54-1f (b). The petitioner asserts that § 54-1f (b) obligated Canace to arrest him if Canace had reasonable grounds to suspect that he had committed or was attempting to commit a crime.[7] The petitioner further asserts that this obligation directly conflicted with Canace's duty of loyalty to his client, the petitioner, and aligned Canace's interests with those of the New Britain police officers who testified for the

state at the petitioner's second criminal trial.

We acknowledge that the petitioner's argument, although perhaps counterintuitive, finds support in the plain language of the statute. The use of the phrase "shall arrest" might suggest that police officers have a mandatory, nondiscretionary duty to arrest suspected felons. Furthermore, that broadly worded mandate could be read to imply that officers must arrest all suspected felons under all circumstances, regardless of when or where the suspected crime was committed. We conclude, however, that the petitioner's interpretation is not the only plausible reading of the statutory language and that adopting his interpretation would "yield absurd or unworkable results . . . ." General Statutes § 1-2z.

It is well established "that the use of the word shall, though significant, does not invariably create a mandatory duty." (Internal quotation marks omitted.) *Electrical Contractors, Inc.* v. *Ins. Co. of the State of Pennsylvania*, 314 Conn. 749, 757, 104 A.3d 713 (2014). "The mere fact that a statute uses the word shall in prescribing the function of a government entity or officer should not be assumed to render the function necessarily obligatory in the sense of removing the discretionary nature of the function . . . ." (Internal quotation marks omitted.) *Mills* v. *Solution, LLC*, 138 Conn. App. 40, 51, 50 A.3d 381, cert. denied, 307 Conn. 928, 55 A.3d 570 (2012). We thus conclude that the statutory language is ambiguous, and, therefore, we "look to other relevant considerations, beyond the legislature's use of the term 'shall,' to ascertain the meaning of the statute." *Electrical Contractors, Inc.* v. *Ins. Co. of the State of Pennsylvania*, supra, 758.

"It is axiomatic that [w]e must interpret the statute so that it does not lead to absurd or unworkable results." (Internal quotation marks omitted.) *Wilkins* v. *Connecticut Childbirth & Women's Center*, 314 Conn. 709, 723, 104 A.3d 671 (2014). In the present case, the petitioner's reading of § 54-1f is unworkable on many levels and would lead to absurd results.

To start, treating the statute as mandatory would deprive police officers of the necessary discretion as to whether and when to arrest a suspected felon. See, e.g., *Castle Rock* v. *Gonzales*, 545 U.S. 748, 761, 125 S. Ct. 2796, 162 L. Ed. 2d 658 (2005) (recognizing "[t]he deep-rooted nature of [law enforcement] discretion, even in the presence of seemingly mandatory legislative commands"); *Smart* v. *Corbitt*, 126 Conn. App. 788, 800, 14 A.3d 368 (discussing importance of police discretion in carrying out routine duties), cert. denied, 301 Conn. 907, 19 A.3d 177 (2011). Undercover work, for example, would become impossible, as an officer would be required to shed his or her cover upon encountering the first suspected felon. Additionally, the petitioner's reading of § 54-1f (b) would require police officers to make

arrests even when the suspected crime was committed long ago, outside the statute of limitations, or outside of the officer's jurisdiction. Thus, although the petitioner's reading of the statute has surface appeal, it ultimately leads to absurd results and is unworkable.[8]

Our conclusion is consistent with *Castle Rock* v. *Gonzales*, supra, 545 U.S. 748, in which the United States Supreme Court indicated, in dictum, that a Colorado statute using language similar to that of § 54-1f (b) would not deprive a peace officer of discretion, despite the use of the phrase "shall apprehend" in the Colorado statute. (Internal quotation marks omitted.) Id., 761. The court explained that "[a] well established tradition of police discretion has long coexisted with apparently mandatory arrest statutes." Id., 760. "In each and every state there are long-standing statutes that, by their terms, seem to preclude nonenforcement by the police. . . . However, for a number of reasons, including their legislative history, insufficient resources, and sheer physical impossibility, it has been recognized that such statutes cannot be interpreted literally. . . . [T]hey clearly do not mean that a police officer may not lawfully decline to . . . make an arrest." (Internal quotation marks omitted.) Id.

For these reasons, we are not persuaded by the petitioner's theory that § 54-1f (b), which gives patrolling officers the authority to arrest suspected felons whom they happen across, *requires* off duty officers, such as Canace, to arrest their clients whenever they suspect that those clients may have committed other crimes, even outside of their jurisdictions.[9] Accordingly, and particularly in light of the United States Supreme Court's hesitance to recognize new categories of per se conflicts of interest beyond the one recognized in *Holloway*, we find that there is no inherent conflict of interest when a police officer who is also a licensed attorney represents a criminal defendant in a different Connecticut jurisdiction. Nevertheless, because the petitioner raised a colorable question of statutory interpretation that had not previously been directly addressed by this state's appellate courts, we conclude that the habeas court abused its discretion in denying certification to appeal.

2

We now turn our attention to the petitioner's alternative argument that Canace's undisclosed status as a law enforcement officer became an actual conflict of interest during the petitioner's second criminal trial insofar as it led Canace to decline to pursue plausible alternative defense strategies or tactics. Before the habeas court, the petitioner pointed to various ways in which Canace's dual role allegedly manifested an actual conflict of interest and compromised the effectiveness of his representation of the petitioner. Before this court, however, the petitioner limits his argument to several

ways in which the purported conflict of interest allegedly led Canace to hold back when cross-examining other police officers, most notably Jerry Chrostowski of the New Britain Police Department.[10] The petitioner contends that, because the state's case in the second criminal trial was built around the testimony of the New Britain police officers who arrested him and searched his apartment, the officers' credibility was paramount, and, therefore, Canace's hesitancy to question the officers was highly prejudicial.

The habeas court thoroughly analyzed the petitioner's claims of inadequate cross-examination and found them to be without merit for several reasons. First, the court credited Canace's testimony that he did not abandon any defense strategies for fear of challenging the credibility of fellow police officers. Second, the habeas court determined that Canace made reasonable strategic decisions as to which lines of inquiry to pursue, using his knowledge of police work to identify instances of poor police investigation. Third, the habeas court recounted all of the ways in which Canace attempted, with varying degrees of success, to challenge the credibility and undermine the testimony of the New Britain police officers. For example, the habeas court found that Canace "pursued a strategy [of attempting to demonstrate] that the police had set up the petitioner . . . ."

The Appellate Court reviewed, at some length, the petitioner's challenges to the findings and conclusions of the habeas court and found them to be meritless. See *Diaz* v. *Commissioner of Correction*, supra, 200 Conn. App. 551–53. Nothing in the petitioner's brief, his argument before this court, or our independent review of the record leads us to reject the conclusions of those courts that Canace's duties as a police officer did not materially impact his representation of the petitioner, and no useful purpose would be served by repeating their analyses here. In short, we see no reason to second-guess the determination of the habeas court that there was no constitutionally relevant actual conflict of interest because the petitioner was unable to establish *Sullivan* prejudice, namely, that Canace failed to pursue some plausible, alternative defense strategy or tactic that was inherently in conflict with or not undertaken due to his other loyalties.

### III

Finally, we emphasize that our conclusion that the petitioner has not demonstrated that Canace's performance suffered from an actual conflict of interest should not be taken to mean that we condone Canace's conduct in the present case. We do not.

Regardless of whether he violated rule 1.7 of the Rules of Professional Conduct,[11] which governs attorney conflicts of interest, it seems likely that Canace violated rule 1.4 of the Rules of Professional Conduct,

which requires an attorney to "promptly inform the client of any decision or circumstance with respect to which the client's informed consent . . . is required . . . ."[12] Rules of Professional Conduct 1.4 (a) (1). Attorney conduct may breach ethical standards, however, without violating the sixth amendment right to counsel. See, e.g., *Mickens* v. *Taylor*, supra, 535 U.S. 176; see also, e.g., *United States* v. *Walter-Eze*, supra, 869 F.3d 906 ("the presumed prejudice rule was not intended to enforce the Canons of Legal Ethics" (internal quotation marks omitted)). Indeed, although there undoubtedly is some overlap, the constitutional right to effective assistance of counsel and the rules that govern attorney ethical conduct serve fundamentally different purposes. See, e.g., *Beets* v. *Scott*, 65 F.3d 1258, 1272 (5th Cir. 1995) ("the purpose of the [s]ixth [a]mendment is not primarily to police attorneys' ethical standards and create a constitutional code of professional conduct . . . [but, rather] its purpose is to [ensure] a fair trial based on competent representation"), cert. denied sub nom. *Beets* v. *Johnson*, 517 U.S. 1157, 116 S. Ct. 1547, 134 L. Ed. 2d 650 (1996).

It is true that Canace had satisfied himself, and the New Haven corporation counsel, that his work as a criminal defense attorney outside of the judicial district of New Haven did not create a per se conflict of interest. But that in no way justified his decision either to mislead the Office of the Chief Public Defender regarding the nature of his work for the city of New Haven—by listing his employment with the city as a "municipal employee," which covers any occupation with the city, rather than as a police officer—or to fail to disclose to his client, the petitioner, that he was simultaneously employed as a police officer. Although those actions may not have risen to the level of an actual conflict of interest for purposes of the sixth amendment, they certainly were unbecoming of an officer of the court.

The form of the judgment of the Appellate Court is improper, the judgment of the Appellate Court is reversed, and the case is remanded to that court with direction to affirm the judgment of the habeas court denying the petition for a writ of habeas corpus.

In this opinion the other justices concurred.

[1] The text of the statute is set forth in part II B 1 of this opinion.

Moreover, although § 54-1f (b) was the subject of technical amendments in 2011; see Public Acts 2011, No. 11-51, § 134; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[2] We granted certification to appeal, limited to the following question: "Did the Appellate Court properly reject the petitioner's claim that the habeas court had abused its discretion by denying his petition for certification to appeal with respect to the claim that defense counsel at his second criminal trial rendered ineffective assistance by failing to disclose his role as an active police officer in the state of Connecticut?" *Diaz* v. *Commissioner of Correction*, 335 Conn. 971, 971–72, 241 A.3d 129 (2020). The respondent contends, and we agree, that the issue is more properly characterized as whether defense counsel rendered ineffective assistance due to an actual conflict of interest arising from his simultaneous role as an active police

officer in the state of Connecticut. See, e.g., *Gomez* v. *Commissioner of Correction*, 336 Conn. 168, 174–75 n.3, 243 A.3d 1163 (2020) (this court may restate certified question).

[3] The paradigmatic *Sullivan* case is a multiple representation case in which the alleged conflict was not disclosed to the trial court, such that the court neither knew nor reasonably should have known that a conflict of interest existed. See *Cuyler* v. *Sullivan*, supra, 446 U.S. 343, 345.

[4] As we discussed, to prevail under *Sullivan*, a petitioner must establish that an *actual* conflict of interest adversely affected counsel's performance. See *Cuyler* v. *Sullivan*, supra, 446 U.S. 348, 350. We note that there is some confusion among the cases as to whether a merely *potential* or theoretical conflict of interest—one in which the interests of the defendant could place the attorney under inconsistent duties at some time in the future—is subject to review under *Strickland* or, rather, whether potential conflicts are not a cognizable basis for an ineffective assistance of counsel claim. The Appellate Court, following the lead of the United States Court of Appeals for the Second Circuit, has followed the former approach. See, e.g., *Santiago* v. *Commissioner of Correction*, 87 Conn. App. 568, 583–84 n.14, 867 A.2d 70 (citing *United States* v. *Williams*, 372 F.3d 96, 102–103 (2d Cir. 2004), for proposition that, to violate sixth amendment, merely potential conflicts of interest must result in *Strickland* prejudice), cert. denied, 273 Conn. 930, 873 A.2d 997 (2005); see also, e.g., *Lopez* v. *United States*, 792 Fed. Appx. 32, 36 (2d Cir. 2019) ("If a defendant can show only a potential conflict, he must show both that it had an adverse effect [on] his attorney's representation and that the conflict resulted in prejudice. . . . This amounts to the showing required by the ordinary ineffective assistance of counsel test from *Strickland*." (Citation omitted.)). Although we question the viability of this approach, in light of the facts that (1) the United States Supreme Court stated in *Cuyler* v. *Sullivan*, supra, 350, that "the possibility of conflict is insufficient to impugn a criminal conviction," (2) the other federal courts of appeals generally have not followed the Second Circuit in treating merely potential conflicts of interest as cognizable claims under *Strickland*, and we are not aware of any court that has reversed a conviction on the basis of a purely potential conflict of interest, and (3) it is difficult to envision how a merely potential conflict of interest could ever result in *Strickland* prejudice (likely altering the result of the proceeding) without first having become an actual conflict, we need not resolve the issue in the present appeal because the petitioner has not alleged that he suffered *Strickland* prejudice as the result of a potential conflict of interest.

[5] It was not entirely clear from the petitioner's briefing and his arguments before this court whether these are distinct theories of conflict of interest or, rather, whether the former represents the alleged conflict and the latter the adverse effect. In either event, we find his claims unpersuasive.

[6] For purposes of brevity, we refer to such individuals as "suspected felons" in this opinion.

[7] Although the petitioner's brief suggests that Canace might have been obligated to arrest the petitioner for the crimes with which he already had been charged, during oral argument before this court, counsel for the petitioner conceded that Canace would have been under no obligation to rearrest the petitioner for those crimes. He contended, however, that there is nevertheless an inherent conflict of interest because, in the course of representation, Canace might have come to suspect that the petitioner had committed other crimes, or that the petitioner intended to offer perjured testimony. He posits that, under § 54-1f (b), Canace would be required to immediately arrest his client if he had any reasonable grounds for such suspicions. Because this presents an inherent conflict, he contends, the representation was a form of structural error for which *Holloway* should be extended to mandate reversal. Given that we conclude that there was no inherent conflict in Canace's duties under Connecticut law, we need not decide whether *Holloway* should be extended to this situation.

[8] Because the use of the word "shall" in the statutory language is ambiguous; see, e.g., *Electrical Contractors, Inc.* v. *Ins. Co. of the State of Pennsylvania*, supra, 314 Conn. 757; and also because a strict facial reading leads to absurd, unworkable results, we may consider the legislative history of the statute. See General Statutes § 1-2z. The legislative history of § 54-1f (b) supports our conclusion that the word "shall" is used in its discretionary, rather than mandatory, sense. The original version of the statute, which gave constables the power to make warrantless arrests, was clearly discretionary rather than mandatory. See Code of Laws, Constables (1650), reprinted in 1 Col. Rec. 509, 522 (J. Trumbull ed., 1850).

In *State* v. *Carroll*, 131 Conn. 224, 38 A.2d 798 (1944), this court interpreted

a predecessor to the current version of the statute, which provided in relevant part that "police officers . . . *shall* arrest, without previous complaint and warrant, any person for any offense in their jurisdiction, when the offender shall be taken or apprehended in the act or on the speedy information of others . . . ." (Emphasis added; internal quotation marks omitted.) Id., 227, quoting General Statutes (1930 Rev.) § 239. Despite the statute's use of the word "shall," this court, in discussing the law, repeatedly characterized it in discretionary terms. See, e.g., *State* v. *Carroll*, supra, 228 ("at common law a peace officer *could* arrest without a warrant" (emphasis added; internal quotation marks omitted)); id. (legislature intended to limit common-law *right* of arrest); id., 230 (statute means that peace officer "*may* make such an arrest" (emphasis added)); id., 231 (police officer "may act" on information he has reasonable grounds to accept as accurate); id. (statute "restricts the *right* of a police officer to arrest" (emphasis added)).

In 1945, when the legislature amended the statute and adopted language substantially similar to that of the current version, the legislators who sponsored the amendment, as well as the representatives of the law enforcement community who championed it, almost universally described the amended statute as providing police officers with the right or authority to make warrantless arrests, rather than the duty or obligation to arrest any suspected felon. See, e.g., 1 S. Proc., 1945 Sess., p. 243, remarks of Senator Albert L. Coles ("Here a police officer would be *permitted* to arrest a known criminal when he sees him on the street. He *could* apprehend him . . . . [N]ow . . . you give him no *authority*." (Emphasis added.)); id., remarks of Senator Leon RisCassi ("The law today and . . . for decades has been that in [b]reach of [p]eace cases you *can arrest* if you see the crime committed or if someone tells you that it has been committed. Of course you *can* always arrest on evidence. This gives you the *right* to arrest on a crime committed or to be committed." (Emphasis added.)); 1 H.R. Proc., Pt. 3, 1945 Sess., p. 860, remarks of Representative Luke H. Stapleton ("[t]his bill would include . . . members of some other organized police force . . . to *permit* them to make arrests without warrants" (emphasis added)); Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 1945 Sess., p. 402, remarks of Police Chief Donnelly, Bridgeport Police Department (arguing that, under proposed bill, police officer "would have something definite or tangible to go by when he is out there in the street and to make that *decision*" (emphasis added)); id., p. 480, remarks of John Gleason, chief of police of the Greenwich Police Department ("a policeman has to make [speedy decisions] . . . so I think he should lay within his rights in making an arrest withou[t] [a] warrant").

[9] We recognize that even the fact that the statute seemingly affords a police officer acting as a defense counsel the *discretion* to arrest a suspected felon outside of the officer's jurisdiction could create ethical problems in the representation of a criminal defendant. See *State* v. *Kuskowski*, 200 Conn. 82, 85–86, 510 A.2d 172 (1986) (§ 54-1f (b) permits extrajurisdictional arrest by officer who witnesses and has probable cause to believe that crime is being committed). We decline to address this issue, however, because the petitioner has not raised the issue, let alone demonstrated how the mere authority to arrest affected Canace's representation, as would be necessary to establish an actual conflict of interest.

[10] The petitioner contends, for example, that Canace failed to adequately cross-examine Chrostowski as to inconsistencies in his and other witnesses' testimony regarding (1) the circumstances under which narcotics were found in the petitioner's apartment, (2) the police officers' prior familiarity with the petitioner, and (3) whether Lockery had purchased drugs from the petitioner.

[11] Rule 1.7 of the Rules of Professional Conduct provides in relevant part: "(a) . . . a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

"(1) the representation of one client will be directly adverse to another client; or

"(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer. . . ."

As we discussed; see part II A of this opinion; the petitioner carries a higher burden in establishing a sixth amendment violation on the basis of an alleged conflict of interest than would be necessary to establish that an attorney ran afoul of the Rules of Professional Conduct. Specifically, in order to establish a violation of his constitutional right, the petitioner must establish that an actual conflict of interest adversely impacted the representation; see, e.g., *Cuyler* v. *Sullivan*, supra, 446 U.S. 348, 350; *Phillips* v. *Warden*, supra, 220 Conn. 133; and not merely that there was a significant risk of a material limitation. See Rules of Professional Conduct 1.7 (a) (2).

[12] The ethics opinion that Canace obtained prior to engaging as a defense counsel expressly required him to disclose his status as a police officer to potential clients because that information was material to the representation and because he might later be required to withdraw if it turned out that his own police department was involved in investigating or prosecuting the petitioner.